822 So.2d 1 (2002)
NAACP, INC., through its Florida Conference of Branches of NAACP, Mattie Garvin, on her own behalf and as mother of Keith Garvin and Keith Garvin, Appellants/Cross-Appellees,
v.
FLORIDA BOARD OF REGENTS and the State Board of Education, Appellees/Cross-Appellants.
No. 1D00-3138.
District Court of Appeal of Florida, First District.
February 26, 2002.
Opinion on Limited Grant of Certification July 26, 2002.
*2 John D.C. Newton, II, and Daniel H. Thompson of Berger Singerman, Tallahassee; Mitchell W. Berger of Berger Singerman, Fort Lauderdale, for Appellants/Cross-Appellees.
Carol A. Licko of Hogan & Hartson, L.L.P., Miami, for Appellees/Cross-Appellants.
WEBSTER, J.,
NAACP, Inc., through its Florida Conference of Branches of NAACP, Mattie Garvin, individually and as mother of Keith Garvin, and Keith Garvin, individually, seek review of a final order entered by an administrative law judge (ALJ) in a rule challenge proceeding. In that order, the ALJ rejected appellants' challenge to all but one of several rule amendments adopted by the Florida Board of Regents and approved by the State Board of Education in response to a request made by the Governor in an executive order "that the Board of Regents implement a policy prohibiting the use of racial or gender setasides, preferences or quotas in admissions to all Florida institutions of Higher Education." By cross-appeal, the Board of Regents and the State Board of Education seek review of those portions of the order holding that appellants had standing to bring the rule challenge, and that the amendment that repealed Florida Administrative Code Rule 6C-6.001(10)(e)6 was "an invalid exercise of delegated legislative authority." We conclude that no competent, substantial evidence was presented to establish that any of the appellants had standing to bring the rule challenge. Accordingly, we reverse, and remand with directions that the ALJ dismiss the rule challenge for lack of standing.

I.
On November 9, 1999, Governor Bush signed Executive Order 99-281, which outlined his "One Florida Initiative." Section 3 of that Executive Order was titled "Non Discrimination in Higher Education." In paragraph (b) of that section, the Governor "request[ed] that the Board of Regents implement a policy prohibiting the use of racial or gender set-asides, preferences or quotas in admissions to all Florida institutions of Higher Education, effective immediately." On February 17 and 18, 2000, in an effort to comply with the Governor's request, the Board of Regents adopted amendments to its rules setting general requirements for student admissions (Fla. Admin. Code R. 6C-6.001), admission requirements for entering freshmen (Fla. Admin. Code R. 6C-6.002), and admission requirements for entering or transferring graduate and professional students (Fla. Admin. Code R. 6C-6.003). The Board of Education approved the amendments on February 22, 2000.
Appellants immediately filed a petition pursuant to section 120.56, Florida Statutes (1999), challenging seven of the amendments that modified the existing rules by (1) reaffirming the state's commitment to increasing diversity in university admissions, but repealing language stating that universities may use alternative admission methods to increase enrollment of a diverse student body; (2) establishing the "Talented 20 Program" which guaranteed university admission to students in the top 20 percent of their high school graduating class as determined by the Florida Department of Education; (3) prohibiting the use of racial and gender preferences in the admissions process, but allowing *3 for the consideration of various race and gender-neutral factors as part of an applicant's "profile assessment"; and (4) repealing the rule providing for alternate admissions to limited access programs, i.e., upper level programs with competitive admissions due to limited space or resources. They claimed that (1) all seven amendments were "an invalid exercise of delegated legislative authority" because there was no specific statutory authority authorizing the Board of Regents to prohibit consideration of factors that a university deemed relevant in the admissions process (such as race, national origin, or gender), to limit alternative admissions, or to guarantee admissions to a defined class of students; (2) the amendment to rule 6C-6.002(5), which provided that class rankings under the "Talented 20 Program" would be determined by the Department of Education, was "arbitrary and capricious" because the Department of Education relied on class ranks provided by individual school districts, which used different ranking systems, pending development of a uniform methodology; and (3) the amendment to rule 6C-6.002(7), which guaranteed university admission to students in the top 20 percent of their high school graduating class, usurped the appropriations power of the legislature by committing the Board of Regents and the Board of Education to expend state funds prior to their appropriation by the legislature.
The Board of Regents and the Board of Education responded with a motion to dismiss for lack of standing. According to the motion, the allegations of the petition were legally insufficient to demonstrate that any of the appellants had standing, either individually or in a representative capacity, because they failed to demonstrate how any of them (or any of NAACP's members) would suffer any injury because of the amendments. Rather, according to the motion, the petition alleged nothing more than speculation regarding what might happen in the future.
Following a hearing on the motion to dismiss for lack of standing, the ALJ held that the petition's allegations were legally insufficient to demonstrate standing as to NAACP in its individual capacity and standing of the Garvins to challenge amendments to rule 6C-6.003, which related to admissions to graduate and professional schools. (Appellants do not challenge those rulings on appeal.) The ALJ denied the motion in all other respects, holding that the allegations were otherwise legally sufficient to demonstrate standing.
A final hearing, at which evidence was presented, was held on April 24-26, 2000. On July 12, 2000, the ALJ entered his final order. In that order, he held that appellants had presented sufficient evidence to establish NAACP's "associational standing... to represent [its] members as persons substantially affected by the proposed amendments," and that the Garvins were "substantially affected by the proposed amendments to [r]ules 6C-6.001 and 6C-6.002." Regarding the merits of the rule challenge, the ALJ held that the repeal of rule 6C-6.001(10)(e)6 (which provided that, "[w]here necessary to achieve established equal access enrollment goals, up to ten percent of the students may be admitted to a limited access program with different criteria") was "an invalid exercise of delegated legislative authority"; but that all of the other challenged amendments were valid. This appeal and cross-appeal follow.

II.
Standing to challenge proposed or existing administrative rules is governed by statute in Florida. Section 120.56(1)(a), Florida Statutes (1999), states that only those who are "substantially affected *4 by a rule or a proposed rule may seek an administrative determination of the invalidity of the rule on the ground that the rule is an invalid exercise of delegated legislative authority." To demonstrate that one is or will be "substantially affected by a rule or a proposed rule," one must establish both that application of the rule will result in "a real and sufficiently immediate injury in fact" and that "the alleged interest is arguably within the zone of interest to be protected or regulated." See, e.g., Lanoue v. Fla. Dep't of Law Enforcement, 751 So.2d 94, 96 (Fla. 1st DCA 1999); Ward v. Bd. of Trs. of Internal Improvement Trust Fund, 651 So.2d 1236, 1237 (Fla. 4th DCA 1995); All Risk Corp. of Fla. v. State Dep't of Labor & Employment Sec., 413 So.2d 1200, 1202 (Fla. 1st DCA 1982); Fla. Dep't of Offender Rehab. v. Jerry, 353 So.2d 1230 (Fla. 1st DCA 1978). An injury is not "real and sufficiently immediate" if the likelihood of its occurrence rests upon speculation or conjecture. See, e.g., Ward, 651 So.2d at 1237; Jerry, 353 So.2d at 1236.

A.
In Florida Home Builders Association v. Department of Labor and Employment Security, 412 So.2d 351, 353-54 (Fla.1982), the court held that trade or professional associations have standing in certain circumstances to challenge, pursuant to section 120.56(1), Florida Statutes, an agency rule on behalf of their members:
To meet the requirements of section 120.56(1), an association must demonstrate that a substantial number of its members, although not necessarily a majority, are "substantially affected" by the challenged rule. Further, the subject matter of the rule must be within the association's general scope of interest and activity, and the relief requested must be of the type appropriate for a trade association to receive on behalf of its members.
Without discussing the justification for doing so, we have previously extended this concept of "associational standing" to associations other than trade or professional associations. See, e.g., Friends of the Everglades, Inc. v. Bd. of Trs. of Internal Improvement Trust Fund, 595 So.2d 186 (Fla. 1st DCA 1992); Farmworker Rights Org., Inc. v. State Dep't of Health & Rehab. Servs., 430 So.2d 1 (Fla. 1st DCA 1983). As no party to this appeal has questioned those decisions, we assume (without deciding) that the assumption made in them was correct, and that NAACP qualifies as an association for purposes of Florida Home Builders though it is not a trade or professional association.
The ALJ concluded that NAACP had "associational standing" to represent its members because "significant numbers of middle or high school students in [its] Florida Youth Councils and college students in [its] Florida College Chapters [would be] substantially affected" by the rule amendments. He did not, however, specify how any of those students would be "substantially affected." Instead, relying on our decision in Coalition of Mental Health Professions v. Department of Professional Regulation, 546 So.2d 27 (Fla. 1st DCA 1989), he said that "[t]he fact that NAACP student members will be regulated by the proposed amendments in their admissions to the [State University System] establishes that they are substantially affected persons, without the need for further factual elaboration of how each member would be personally affected." This was error.

B.
In Coalition, a coalition consisting of several professional associations whose members would all be subject to "three *5 rules which propose[d] to define the practices of clinical social workers, marriage and family therapists and mental health counselors" appealed a final order denying it standing to challenge the proposed rules. 546 So.2d at 28. We reversed, "holding that [the coalition's] members, being subject to and regulated by the proposed rules, have party status." Id. We said, further, that "[t]he fact that appellant's members will be regulated by the proposed rules is alone sufficient to establish that their substantial interests will be affected and there is no need for further factual elaboration of how each member will be personally affected." Id. In essence, we created what appears to be a presumption. However, it was not intended to have wide application but, rather, was intended to apply only to trade or professional associations whose members were to be regulated by the challenged rules. It seems to us that several considerations support such a reading.
The operative facts in Coalition included that the coalition was composed of professional associations, and that all of the associations' members would be regulated, in the practice of their professions, by the proposed rules. Id. There is nothing in the opinion to suggest that the court intended the presumption it had crafted to apply to any other factual scenario. Moreover, the opinion must be read in light of that in Florida Home Builders, in which the supreme court had limited its holding regarding "associational standing" to trade and professional associations. To do otherwise would, at least arguably, place Coalition in conflict with Florida Home Builders. Finally, a presumption is "[a] legal inference or assumption that a fact exists, based on the known or proven existence of some other fact or group of facts." Black's Law Dictionary 1203 (7th ed.1999). The creation of a presumption such as that in Coalition makes sense in the context of a trade or professional association all of whose members will be regulated by the challenged rules. It makes considerably less sense in other contexts, such as that presented here.
The rule amendments challenged by appellants would not "regulate" NAACP's members in the sense that the word was used in Coalition. The amendments would have no impact on them whatsoever unless and until they applied for admission to a university undergraduate, graduate or professional program, and even then there is no evidence to suggest that any impact would be adverse. In short, the amendments have not been shown to have an impact on NAACP's members that is different from the impact they will have on all citizens. In this sense, we find instructive the discussion in State Board of Optometry v. Florida Society of Ophthalmology, 538 So.2d 878 (Fla. 1st DCA 1988), an opinion authored by Judge Zehmer, who, only several months later, also authored Coalition. Reversing the hearing officer's decision that the Florida Society of Ophthalmology and the Florida Medical Association had standing to challenge a rule adopted by the Florida Board of Optometry intended to permit "optometrists licensed under chapter 463[, Florida Statutes,]... to administer certain topical ocular drugs in the diagnosis and treatment of the human eye[, which] practice previously fell within the exclusive domain of ... physicians who were licensed under chapters 458 and 459 and practiced ophthalmic medicine" (id. at 879), the court said:
[P]etitioners' continuing general interest in the quality of eye care being provided to the public is not predicated upon a legally recognized right of sufficient immediacy and reality to support their standing to challenge the validity of the adopted rule.... Petitioners, representing or being physicians licensed under *6 chapters 458 and 459, are not subject to regulation or control under chapter 463, are not subject to regulation or control by the rule, and cannot predicate standing on the notion that the application of the challenged rule will prevent or obstruct their practicing ophthalmic medicine.... Whether application of the challenged rule will cause the petitioning physicians, or any physicians represented by the petitioning associations, an injury of sufficient immediacy and reality under the criteria set forth in Jerry [i.e., Fla. Dep't of Offender Rehab. v. Jerry, 353 So.2d 1230 (Fla. 1st DCA 1978)] is purely a matter of speculation and conjecture.
Id. at 881. To read Coalition as did the ALJ would render unnecessary any showing that "a substantial number" of an association's members will be "substantially affected" (i.e., injured) by a challenged rule, as required by Florida Home Builders. Instead, "associational standing" would be established whenever an association could demonstrate that any of its members might be subject to the application of the rule at some future date.

C.
Because NAACP was not entitled to rely on the Coalition presumption, it was obliged to satisfy the test for "associational standing" announced in Florida Home Builders; i.e., it was obliged to establish by competent, substantial evidence that "a substantial number of its members ... [would be] `substantially affected'" by the challenged amendments, that "the subject matter of the rule [is] within [its] general scope of interest and activity," and that "the relief requested [is] of the type appropriate for a[n] ... association to receive on behalf of its members." 412 So.2d at 353-54.
NAACP offered no evidence to suggest that any of its members will suffer "a real and sufficiently immediate injury in fact" as a result of implementation of any of the proposed rule amendments. On the contrary, Leon Russell, the immediate past president of NAACP's Florida Conference of Branches and a member of its national board of directors, testified that it was impossible to predict what effect the amendments would have on any of NAACP's members. On appeal, appellants have conceded that the true focus of their attack on the rules is that they do not wish to see "successful affirmative action programs and policies in the admissions process" replaced "with an untried `Talented 20' program and a prohibition on `preferences.'" In other words, they are unwilling to have what they believe has been a beneficial policy replaced by one that may or may not prove to be equally beneficial.
We conclude that NAACP failed to present competent, substantial evidence to establish that any of its members would suffer "a real and sufficiently immediate injury in fact" because of implementation of any of the rule amendments challenged. As a result, it failed to demonstrate that any of its members would be "substantially affected" by implementation of any of the challenged amendments. Therefore, it failed to carry its burden of establishing "associational standing" pursuant to the test announced in Florida Home Builders, and we need not consider whether it met the other requirements, including establishing "that the alleged interest [was] arguably within the zone of interest to be protected or regulated." We hold that NAACP lacked "associational standing" to challenge the rule amendments. Accordingly, we must reverse the ALJ's decision to the contrary.

III.
Appellant Keith Garvin is an African-American who was in the tenth grade *7 at a Florida public high school. He was also active in the NAACP Youth Council. He had not applied to any university, but, upon graduation from high school, hoped to major in computer science or engineering at a university in the State University System. Appellant Mattie Garvin is Keith's mother. She was a member of NAACP, and was interested in "provid[ing] her son ... with the best possible educational opportunities." The ALJ concluded that the Garvins had standing to challenge the amendments to rules 6C-6.001 and 6C-6.002 because they "[we]re substantially affected by th[ose] proposed amendments." He did not, however, specify how either Garvin would be "substantially affected" by the amendments to either rule. Instead, he again relied on Coalition, concluding that it was sufficient that "Keith Garvin, and Mattie Garvin on his behalf, [would] have their admission to the [State University System] universities regulated and controlled by the proposed amendments." This, too, was error.
As we have previously explained, the presumption created in Coalition was intended to apply only to trade or professional associations whose members will be regulated by the challenged rules. It was clearly not intended to extend to individuals.
To establish standing for purposes of section 120.56(1), the Garvins were both obliged to demonstrate by competent, substantial evidence that they would be "substantially affected" by the proposed rule amendments. Neither of them carried their burden because neither presented any evidence to suggest that he or she would suffer "a real and sufficiently immediate injury in fact" as a result of implementation of any of the proposed amendments. On the contrary, the evidence indicates that, at his current rate of academic progress, Keith will be eligible for admission regardless of the impact that any of the challenged amendments might have. Moreover, because Keith had two more years of high school to complete, any claimed injury would not be "real and sufficiently immediate" but, rather, would rest upon rank speculation. But for her desire "to provide her son ... with the best possible educational opportunities," Mrs. Garvin's claim is derivative of her son's. Her understandable desire to ensure that her son receives a firstclass education is one shared by all parents.
We conclude that Keith Garvin and his mother failed to present competent, substantial evidence that either would suffer "a real and sufficiently immediate injury in fact" because of implementation of any of the rule amendments challenged. As a result, they failed to demonstrate that they would be "substantially affected" by implementation of any of the challenged amendments. Therefore, we hold that they lacked standing to challenge the rule amendments. Accordingly, we must reverse the ALJ's decision to the contrary.

IV.
Because we have concluded that appellants lacked standing to bring the rule challenge, we do not address the merits of that challenge. We note that, as our decision does not reach the merits of appellants' challenge to the rule amendments, there is nothing to prevent appellants from subsequently bringing another challenge, provided they are able to satisfy the requirements for standing. See, e.g., Allbright v. Hanft, 333 So.2d 112, 114 (Fla. 2d DCA 1976) ("a judgment rendered on any grounds which do not involve the merits of the action may not be used as the basis for the operation of the doctrine of res judicata"); § 120.56(3)(a), Fla. Stat. (2000) ("A substantially affected person may seek an *8 administrative determination of the invalidity of an existing rule at any time during the existence of the rule"). We reverse the final order, and remand with directions that the ALJ enter an order dismissing the rule challenge for lack of standing.
REVERSED and REMANDED, with directions.
POLSTON, J., CONCURS; BROWNING, J., dissents with written opinion.
BROWNING, J., dissents.
Today, this court holds that Appellants lack the requisite standing under Chapter 120, Florida Statutes, to challenge the proposed rules. It does so even though, over 12 years ago, this court held any association whose members will be "regulated" by a proposed rule is "alone sufficient to establish that their substantial interests will be affected and there is no need for further elaboration of how each member will be personally affected." See Coalition of Mental Health Professions v. Department of Professional Regulation, 546 So.2d 27, 28 (Fla. 1st DCA 1989). Honoring stare decisis, this court subsequently applied such principle to allow standing for associations to attack a proposed rule because its members feared it would cause an increase in manatee injuries and accelerate manatee habitat deterioration in Tampa Bay; and to attack a proposed rule re-classifying the use of a parcel of state land from "environmentally endangered" to a "juvenile facility," because the reclassification would interfere with recreation use and cause environmental damage to the proposed site, and association members had expended "considerable revenues to protect the site." See Southwest Florida Water Mgmt. District v. Save the Manatee Club, Inc., 773 So.2d 594 (Fla. 1st DCA 2000); Friends of the Everglades, Inc. v. Bd. of Trs. of Internal Improvement Trust Fund, 595 So.2d 186 (Fla. 1st DCA 1992). The same principle was applied to individuals, and allowed an engineer to attack proposed rules that changed existing specifications for construction of docks and piers because he would be "regulated" by the rules when and if he designed docks and piers in compliance with the proposed rules. See Ward v. Bd. of Trs. of Internal Improvement Trust Fund, 651 So.2d 1236 (Fla. 4th DCA 1995). The majority today promulgates new law in this area that is not only wrong, but, in my judgment, effects a departure from these precedents and a significant change in the law of standing enunciated by this court. Thus, I would adhere to precedent and affirm the ALJ's determination that Appellants have standing, and review their other contentions on the merits.

I.
Prior to the proposed rules' adoption, affirmative action programs were lawfully in place to regulate the admission of African-American and other minority students to the State University System (SUS). Whether affirmative action is appropriate or inappropriate is not the question before this court today. Rather, the question is whether Appellees have the prerequisite, specific power conferred by statute, to repeal existing affirmative action programs that regulate minority admissions to the SUS. The proposed rules repeal existing affirmative action programs established by rules, and specifically prohibit any use of race or gender set-asides, preference or quotas in minority admission to the SUS. Because enactment of agency rules touches upon an area often abused, the Florida Legislature amended section 120.52(8), Florida Statutes. (1999)[1], to prohibit *9 agencies from exercising broad legislative prerogatives under the guise of rule making. The section, as amended, provides:
A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious or is within the agency's class of powers and duties, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific powers and duties conferred by the same statute.

Id. (emphasis added).
Under this section and the precedents of this court, Appellants immediately attacked the proposed rules as an unlawful exercise of rule making prohibited by section 120.52(8). Rather than address this issue, the majority determines the NAACP's members are not "substantially affected" and, thus, that Appellants are unable to maintain their rule challenge. I disagree.

II.
Chapter 120, Florida Statutes, was enacted to expand public access and supervision over governmental agencies. See Florida Home Builders Association v. Department of Labor & Employment Security, 412 So.2d 351, 352-353 (Fla.1982). This right is not limited to persons "substantially affected" under section 120.56(1)(a), Florida Statutes (1999), but includes "associations" such as trade, professional, environmental, etc. The Court in Florida Home Builders reasoned that denial of associational standing in rule challenges "defeats this purpose [public access] by significantly limiting the public's ability to contest the validity of agency rules." Id. at 353. In keeping with the rationale expressed by Florida Home Builders, this court has found sufficient standing in analogous situations to support a rule challenge by associations. See Save the Manatee Club, Inc., 773 So.2d at 594; Coalition, 546 So.2d at 28; Friends of the Everglades, Inc., 595 So.2d at 189-190; Ward, 651 So.2d at 1238-1239.

III.
In my judgment, Coalition compels a determination that the NAACP has standing to challenge the proposed rules. In Coalition, this court stated:
... appellant's members, being subject to and regulated by the proposed rules, have party status in these rule-making proceedings, not just as intervenors allowed to participate in the discretion of the hearing officer under § 120.52(12)(c), but as persons "whose substantial interests will be affected by proposed agency action" under § 120.52(12)(b) and thus are "substantially affected persons" within the meaning of § 120.54(4). The fact that appellant's members will be regulated by the proposed rules is alone sufficient to establish that their substantial interests will be affected and there is no need for further factual elaboration of how each member will be personally affected. *10 Since the motion to intervene shows without contradiction or dispute that members of the Coalition will be so affected, the Coalition's right to party status is established. Florida Home Builders Ass'n v. Department of Labor and Employment Security, 412 So.2d 351 (Fla.1982). The Coalition was not required to allege precisely how, or even whether, the rules modified, enlarged or restricted the scope of practice by its members so long as it was made apparent that their conduct was regulated by the proposed rules.
Id. at 28 (emphasis added). The reasoning of Coalition clearly compels the conclusion that the NAACP has standing. The NAACP's African-American members' admission to the SUS will be regulated by the proposed rules and, under Coalition, the NAACP is not required to allege and prove "precisely how or even whether" its members will be affected, but that their conduct will be "regulated" by the proposed rules. Any other construction of Coalition departs from the plain meaning of the words used. The majority, by construing Coalition as inapplicable to this case, "de facto" recognizes its significance and seeks to justify its nonapplication by distinguishing it. By doing so, in my judgment, the majority fails to follow proper rules of precedential construction, incorrectly assesses the degree of legal injury suffered by the NAACP's African-American students, and reaches an erroneous conclusion.
In my judgment, case law, just like statutes, is construed to effect an opinion's intent. See Holly v. Auld, 450 So.2d 217 (Fla.1984). The majority implicitly recognizes this rule by liberally referring to what was intended by this court in Coalition. However, the majority overlooks the rule's sub-tenet that, absent an ambiguity, the words used are accorded their ordinary meaning. There is no ambiguity in the crucial word of the Coalition opinion: "regulated." "Regulate" is defined in American Heritage College Dictionary (3rd ed.1993) as "To control or direct according to a rule." NAACP's members clearly meet this definition and proved its application by competent, substantial evidence by showing African-American students' preferential admission rights to the SUS under the repealed affirmative action programs are abolished, and they are instead treated as all other studentsminority and non-minority.
In my judgment, the majority's determination that African American students are not "substantially affected" is a gross misconstruction of the plain words used in Coalition. The majority finds Coalition inapplicable because that case was based on an alleged "presumption" not present in this case. I find it strange that the presumption, which the majority finds essential to the decision in Coalition, is not mentioned by the Coalition court. Further, not only does the majority approach reject limiting construction of opinions when there is no ambiguity, it is contrary to experience. I have never seen nor heard of a case that turned on a presumption, as the majority attributes to Coalition, without the actual word "presumption" being prominently and often used. See Owens v. Publix Supermarkets, Inc., 802 So.2d 315 (Fla.2001); Beal Bank, SSB v. Almand and Associates, 780 So.2d 45, 58 (Fla.2001); Burns v. GCC Beverages, Inc., 502 So.2d 1217, 1220 (Fla.1986); Knoff v. Knoff, 751 So.2d 167, 169 n. 1 (Fla. 2d DCA 2000). Although such factors should preclude the majority's use of a presumption as a basis for its determination, there is an additional reason that precludes its use.
"Presumptions, which are created either judicially or legislatively and arise from *11 considerations of fairness, public policy, and probability, are used to allocate the burden of proof." Owens, 802 So.2d at 331, citing generally Charles W. Ehrhardt, Florida Evidence § 301.1 (2000 ed.). After the presumption shifts the burden, the opposing party may introduce evidence to prove the presumed facts do not exist. Any use of a presumption must include the right of rebuttal by the opposing party. See Straughn v. K & K Land Mgmt., Inc., 326 So.2d 421, 424 (Fla.1976) (holding the test for the constitutionality of statutory presumptions is twofold: a rational connection between the fact proved and the ultimate fact presumed, and a right to rebut in a fair manner); Lidsky v. Florida Dep't of Ins., 643 So.2d 631, 634 (Fla. 1st DCA 1994) (same); Charles W. Ehrhardt, Florida Evidence § 302.1, at 90 ("The only presumptions that are valid in Florida are rebuttable presumptions."). Such circumstances do not exist in Coalition. The association in Coalition moved to intervene to challenge a proposed rule. The ALJ denied the motion for lack of standing, and the association appealed. The only issue before the Coalition court was whether the allegation of being "regulated" by the proposed rule was sufficient to confer standing if proved. The Coalition court reversed the ALJ, and found the association members were "regulated" by the proposed rule and, thus, "substantially affected." The requirement that special injury must be alleged and proved was specifically rejected. Accordingly, an allegation of being regulated by a proposed rule provides standing as a matter of law when supported by competent, substantial evidence. Any indications that the Coalition decision was based on a presumption, or involved the use of a presumption, are conspicuously absent. No evidence was adduced that shifted the burden of proof and gave a right of rebuttal to the opposing party. These factors are a prerequisite to the use of a presumption in litigation; when not involved, any "presumption" upon which the court's decision is based is invalid and cannot serve as the basis for the decision. See Straughn, 326 So.2d at 424; Lidsky, 643 So.2d at 634. The Coalition court promulgated a rule of law that being regulated by a proposed rule confers standing. For these reasons, the majority's use of a "presumption" to find otherwise is a departure from existing law and restricts public access to the administrative process contrary to the intent of Chapter 120. See Florida Home Builders, 412 So.2d at 352-353.
Next, the majority draws a distinction between the professional association involved in Coalition and the NAACP, and thus, by implication, determines the injury in the Coalition context is more substantial than the effect of the proposed rules on African-American students' admission to the SUS. I strongly disagree. I believe this is faulty reasoning unsupported by a comparison of the two cases. In my judgment, in a comparison between professional and educational rights, educational rights are more substantial. Regulation of a professional's rights is generally an annoyance that can be, and often is, mitigated by future legislative change. But admission to college affects a person's entire life and is the time-honored "ladder for advancement" for minority citizens. It is no accident that the greatest litigation battles of the civil rights movement were fought over education. See Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Thus, contrary to the majority, I believe the impact of the proposed rules on the NAACP's members is far more substantial and profound than the impact suffered by *12 the professionals in Coalition, or other professionals in similar situations. Furthermore, a practical effect of the majority opinion is that the education of African American students who experience the effect necessary to maintain a rule challenge under the vague and stringent majority standard will be delayed during the two-year period required for rule-challenge litigation, which is a result sought to be prevented by Chapter 120. See Florida Home Builders, 412 So.2d at 352-353.
Finally, the majority seeks to support its result by determining that "In short the amendments have not been shown to have an impact on NAACP's members that is different from the impact of all citizens." If this statement were true, the majority's result would be correct. However, this is clearly not the case. Such a finding can be made only if the obvious impact on African-American students, as compared to nonminority students, under the proposed rules is misapprehended. Before enactment of the proposed rules, African-American students' admission to the SUS was under affirmative action programs as members of a recognized minority who, in certain circumstances, would receive a "boost" not available to non-minority students. A white male student and other non-minority students were not entitled to a similar advantage. The proposed rules effect a complete change and make African-American students subject to the identical admission standards as non-minority students. Thus, contrary to the majority's contention, the effect of the proposed rules on African-American students plainly differs from its effect on non-minority students, and this, without question, provides standing to the NAACP.
Furthermore, I do not agree that State Board of Optometry v. Florida Society of Ophthalmology, 538 So.2d 878 (Fla. 1st DCA 1988), lends any support to the majority's determination that the proposed rules' impact on African-Americans is no different from "the impact on all citizens." In Board of Optometry, the professionals challenging the rule were not "affected" other than as members of the general public interested in good quality eye care. The professionals were not contesting a rule that changed their rights or privileges, i.e., to prescribe a particular medication. To the contrary, the challenged rule merely added another group of practitioners who could administer the same drug as the professionals. This court succinctly noted the professionals were not "subject to regulation or control by the rule" as enunciated by Coalition. Here, there exists no similar legal distinction to preclude application of Coalition. By the proposed rules' enactment, African-American students lose their right to a privileged status under existing affirmative action programs. I believe it is reasonable to assume had the professionals in Board of Optometry faced a rule that reduced the range of medication they could prescribe, a different result would have been reached.
Although I believe Coalition controls here, my reasoning is further supported by other precedents of this court. See Save the Manatee Club, Inc., 773 So.2d at 594; Friends of the Everglades, 595 So.2d at 189-190. I find Save the Manatee Club, Inc. particularly instructive. There, the mere fear that the challenged rule would increase the number and degree of injuries to manatees and result in harm to their habitat, was sufficient to confer standing to support a rule challenge. In fact, the members' standing was so obvious that the question of whether they had standing never arose. This court did not require a mangled manatee or an actual reduction in the quality of the manatee's habitat to confer standing: the association members' fear of such impact was sufficient. Association members' lives would only be affected *13 by a potential impact on their love of manatees: an emotional injury, so to speak. However, the proposed rules affect every aspect of African-American students' right to full citizenship by repealing affirmative action programs that give them a "boost" to off-set the "past abuses" their race has experienced from affirmative state action in reverse.[2] Without in any way diminishing the importance of manatees, in my judgment, the legal impact on NAACP's African-American students far exceeds that suffered by members of the Save the Manatee Club. Thus, if fear of an emotional impact provides standing, clearly the substantial and vital interest impacted here supports the NAACP's standing.

IV.
I also believe that the Garvin family has standing, as the minority student's admission to the SUS will be regulated. See Ward, 651 So.2d at 1238-1239.

V.
If I had a concurring vote, I would certify this case to the Florida Supreme Court as one of exceptional importance. The area of standing has become so confused that a clarifying opinion is badly needed. In my judgment, it is unfathomable that Chapter 120 sanctions what the majority has determined. The proposed rules drastically change the admission standards that apply to African-Americans' and other minority students' admission to the SUS. African-Americans constitute fifteen percent of the State's population, and their rights can best be asserted by the NAACP because "the cost of instituting and maintaining a rule challenge proceeding may be prohibitive" for the NAACP's members, who are often poor and unable to maintain individual rule challenges. See Florida Home Builders, 412 So.2d at 353. Moreover, there exists no rational basis upon which to allow individuals' fear of injuries to manatees and their habitat, regulation of professionals, and use of endangered lands, etc., to support standing, and deny a similar status to the NAACP's minority students faced with the repeal of affirmative action programs. If this is the correct status of the law, it should be sanctioned by the Florida Supreme Court, not a split panel of this court. Furthermore, Florida Home Builders, by passage of time, has become somewhat meaningless, because in almost every case involving standing, opposing parties advance it to support their respective positions, with equal conviction and intensity. In the area of standing, the case provides all things, except clear guidance, to all litigants. Accordingly, I would certify the following question as one of great public importance:
DO APPELLANTS HAVE STANDING TO ATTACK THE VALIDITY OF THE PROPOSED RULES UNDER FLORIDA HOME BUILDERS, ASS'N V. DEPARTMENT OF LABOR AND EMPLOYMENT SECURITY, 412 So.2d 351 (Fla.1982).
Furthermore, if the opinion expressed in this dissent is correct, as I reason, the majority opinion directly conflicts with Florida Home Builders.

*14 VI.
While I disagree with the majority, I realize the law of standing is often hard to define and subject to dispute. However, in my judgment, the crucial factor is how one weighs the impact of the proposed rules on African-Americans' admission rights to the SUS, as compared to their rights under the repealed affirmative action programs. My "scales" indicate African-American students' admission to the SUS under legally established affirmative action programs cannot be repealed by agency rules without giving those covered by such programs the right to challenge the repeal, because existing case law indicates they are "substantially affected" for rule challenge purposes. On the merits, Appellants might not be entitled to relief. However, they have the interest required as "substantially affected parties" to challenge the proposed rules' validity. Accordingly, I would affirm the ALJ's ruling on standing and review the ALJ's ruling that the proposed rules were validly enacted. For these reasons, I respectfully dissent.

ON MOTION FOR REHEARING, REHEARING EN BANC AND, ALTERNATIVELY, FOR CERTIFICATION
PER CURIAM.
Appellants/cross-appellees have filed a motion requesting rehearing, rehearing en banc and, alternatively, certification of questions of great public importance. In light of the significant public policy implications of the rules challenged, and recognizing that the court is divided on the issue of whether appellants/cross-appellees have standing to maintain this rule challenge, we certify to the supreme court the following question as one of great public importance:
DO APPELLANTS/CROSS-APPELLEES HEREIN HAVE STANDING TO MAINTAIN CHALLENGES TO THE SUBJECT RULES?
In all other respects, the motion filed by appellants/cross-appellees is denied.
WEBSTER, BROWNING and POLSTON, JJ., CONCUR.
NOTES
[1] A discussion of the of the evolution and reason for such amendment is found in Save the Manatee Club, Inc., 773 So.2d at 598.
[2] Affirmative action programs, in part, have their geneses in society's attempt to undo the adverse impact of state-sanctioned slavery and decades of state-sanctioned discrimination against African-Americans. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (stating that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it.").