# Third District Court of Appeal

## State of Florida

Opinion filed December 27, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-23
Lower Tribunal No. 15-6009RP

_____

**K.M.,**
Appellant,

vs.

**Florida Department of Health,**
Appellee.

An Appeal from State of Florida, Division of Administrative Hearings.

Moyle Law Firm, P.A., and Karen A. Putnal, Jon C. Moyle, and Robert A. Weiss, (Tallahassee), for appellant.

Jay Patrick Reynolds, Chief Litigation Counsel (Prosecution Services Unit), and Nichole C. Geary, General Counsel (Tallahassee), for appellee.

Before LAGOA, EMAS, and LOGUE, JJ.

LAGOA, J.

Appellant, K.M., seeks reversal of a final administrative order dismissing K.M.'s petition for a formal administrative hearing. Because K.M. would not be "substantially affected" by the Department of Health's repeal of Rule 64C-4.003 of the Florida Administrative Code, we find that the administrative law judge did not err in determining that the Division of Administrative Hearings lacked jurisdiction to rule on the merits of K.M's petition. K.M. does not have standing under section 120.56(1)(a), Florida Statutes (2015), to assert her challenge to the Department of Health's proposed repeal. Accordingly, we affirm the order dismissing the petition for lack of jurisdiction. This opinion does not address the merits of K.M.'s case.

## I.   FACTUAL AND PROCEDURAL HISTORY

On July 29, 2015, the Department of Health ("DOH"), filed a Notice of Proposed Rule for the purpose of repealing Rule 64C-4.003 of the Florida Administrative Code (the "Rule"). The DOH summarized the Rule as one that required pediatric cardiac facilities approved by Children's Medical Services ("CMS") to comply with the CMS Pediatric Cardiac Facilities Standards mandated by the Rule and to submit a number of forms that were adopted by the Rule. The Rule, titled "Diagnostic and Treatment Facilities or Services -- Specific," provides:

> (1) CMS Pediatric Cardiac Facilities. CMS Headquarters approves pediatric cardiac facilities for the CMS Network on a statewide basis upon consideration of the recommendation of the Cardiac Subcommittee of the CMS Network Advisory Council. **CMS approved pediatric cardiac facilities must comply with the CMS Pediatric Cardiac Facilities Standards, October 2012** . . . . CMS

2

approved pediatric cardiac facilities must collect and submit quality assurance data annually [using the prescribed forms] . . . .

(2) CMS Cardiac Regional and Satellite Clinics. CMS Headquarters approves regional and satellite cardiac clinics for the CMS Network on a statewide basis upon consideration of the recommendation of the Cardiac Subcommittee of the CMS Network Advisory Council. **CMS regional and satellite clinics must comply with the CMS Cardiac Regional and Satellite Clinic Standards, October 2012**. . . .

(3) The standards and forms are incorporated herein by reference and are available from CMS Headquarters, 4052 Bald Cypress Way, Bin A06, Tallahassee, FL 32399-1707.

Fla. Admin. Code R. 64C-4.003 (2015) (emphasis added). The DOH sought to repeal the Rule because, according to the DOH, the Rule's regulation of pediatric care facilities exceeded the DOH's statutory authority.

Florida's CMS program provides financial assistance for medically necessary services—similar to the benefits available under Medicaid—to children with special health care needs who meet the program's eligibility requirements. The DOH reimburses health care providers for services rendered through the CMS network, a statewide managed system of care in which providers may participate under contract with the program. In order to receive reimbursement under the CMS program, providers and facilities must be credentialed by the DOH.

K.M., a CMS beneficiary, suffers from a serious heart condition requiring pediatric cardiac services. K.M. has received such services from participating CMS providers, including CMS-approved pediatric cardiac facilities that currently

3

must comply with the Rule. K.M. will likely require future pediatric cardiac care from CMS-approved providers, including facilities currently regulated by the Rule.

On October 22, 2015, K.M. filed a Petition for Determination of Invalidity of Proposed Rule (the "Petition")[1] with the Division of Administrative Hearings pursuant to section 120.56(2), Florida Statutes (2015). K.M. alleged that the DOH's proposed repeal of the Rule was an invalid exercise of delegated legislative authority under Florida's Administrative Procedure Act and would reduce the quality of care available within the CMS program.

The final hearing was held on November 20, 2015. K.M. called two pediatric cardiologists—Louis B. St. Petery, Jr. ("Dr. St. Petery") and Ira H. Gessner ("Dr. Gessner")—to testify. Dr. St. Petery testified regarding K.M.'s medical condition, diagnosis, prognosis, and treatment, including K.M.'s need for additional cardiac surgery and diagnostic services. Although not offered by K.M. to support K.M.'s standing argument, Dr. St. Petery concluded his testimony with his opinion that the quality of care provided at CMS clinics was related to the Rule's volume requirements for procedures performed in regional and satellite clinics.

---

[1] The Petition was filed by petitioners W.D., C.V., K.E., and K.M., all of whom are CMS beneficiaries requiring pediatric cardiac services from CMS-approved providers. Only K.M., however, seeks review of the final administrative order dismissing the Petition for lack of jurisdiction.

Dr. Gessner, who currently serves on the CMS Cardiac Technical Advisory Panel and was a statewide consultant to the CMS program for pediatric cardiology services for over thirty-eight years, was identified by K.M. as the witness who would testify, for standing purposes, regarding the injury K.M. would suffer from repeal of the Rule. Dr. Gessner testified that the Rule's reporting requirement was "meaningful" with respect to assuring quality in programs certified by the CMS pediatric cardiac services program. Dr. Gessner also testified that if the Rule were repealed, there was a "risk of changes in programs developing and continuing in a way that is not consistent with the current standards [and] would allow circumstances to exist within a given program that raise the potential for deterioration of aspects of a program . . . as to make it risky for patients to be cared for within that program." Dr. Gessner further testified: "Now, this is—of course we don't expect people to behave badly simply because there are no standards. But we know that it is possible for a program to have individuals leave, be recruited to other institutions, or otherwise be without a particular component."

Following the testimony, the administrative law judge (the "ALJ") found that K.M. failed to prove the proposed deregulation of CMS-approved pediatric cardiac facilities would, in fact, have a real or immediate effect on the quality of care available through the CMS network. As such, the ALJ concluded that K.M.

5

lacked standing to challenge the Rule's repeal and dismissed K.M.'s Petition for lack of jurisdiction. This appeal followed.

## II.  STANDARD OF REVIEW

In an appeal from a final administrative order, we review the ALJ's findings of fact to determine whether they are supported by competent, substantial evidence. Peace River/Manasota Reg'l Water Supply Auth. v. IMC Phosphates Co., 18 So. 3d 1079, 1082 (Fla. 2d DCA 2009) (citing § 120.68(7)(b), Fla. Stat. (2004)). "If an administrative law judge's final order depends on any fact found by the administrative law judge, the court shall not substitute its judgment for that of the administrative law judge as to the weight of the evidence on any disputed finding of fact." § 120.68(10), Fla. Stat. (2015). However, "findings that are interpretations of relevant law are subject to a de novo review." Jacoby v. Fla. Bd. of Med., 917 So. 2d 358, 359 (Fla. 1st DCA 2005) (citing Fla. Bd. of Med. v. Fla. Acad. of Cosmetic Surgery, Inc., 808 So. 2d 243 (Fla. 1st DCA 2002)); accord Office of Ins. Regulation & Fin. Servs. Comm'n v. Secure Enters., LLC, 124 So. 3d 332, 336 (Fla. 1st DCA 2013) ("Standing is a question of law subject to de novo review.").

## III.  ANALYSIS

Under the Administrative Procedure Act, "[a]ny person substantially affected by a rule or a proposed rule may seek an administrative determination of

the invalidity of the rule on the ground that the rule is an invalid exercise of delegated legislative authority." § 120.56(1)(a), Fla. Stat. (2015). As such, in order to have standing to challenge the validity of a rule or proposed rule, the party must be "substantially affected" by the rule. See, e.g., NAACP, Inc. v. Fla. Bd. of Regents, 863 So. 2d 294, 296 (Fla. 2003); Sarnoff v. Fla. Dep't of Highway Safety & Motor Vehicles, 825 So. 2d 351, 356 (Fla. 2002).

In Jacoby, the First District Court of Appeal held that a person is "substantially affected" by a rule if the petitioner has established: "(1) that the rule or policy will result in a real and immediate injury in fact, and (2) that the alleged interest is within the zone of interest to be protected or regulated." 917 So. 2d at 360; accord Lanoue v. Fla. Dep't of Law Enforcement, 751 So. 2d 94, 96 (Fla. 1st DCA 1999); Ward v. Bd. of Tr. of the Internal Improvement Tr. Fund, 651 So. 2d 1236, 1237 (Fla. 4th DCA 1995). "Thus standing depends on the nature of the injury asserted and the purpose and scope of the administrative proceeding." Peace River, 18 So. 3d at 1083. Petitioner bears the burden of establishing standing. Id. at 1084.

We find that K.M. does not meet the real and immediate injury prong of the "substantially affected" test. Although the Florida Supreme Court has noted that a petitioner need not demonstrate that it already has suffered actual harm in order to have standing in an administrative rule challenge proceeding, see NAACP, 863 So.

7

2d at 300, the prospective injury asserted must not be the product of pure speculation and conjecture, see Ward, 651 So. 2d at 1237; see, e.g., Prof'l Firefighters of Fla., Inc. v. Dep't of Health & Rehab. Servs., State of Fla., 396 So. 2d 1194, 1196 (Fla. 1st DCA 1981).  K.M. primarily relies on NAACP and Peace River to establish standing to challenge the DOH's proposed rule repeal.  Both cases, however, are distinguishable.

In NAACP, a civil rights organization challenged proposed rule amendments eliminating "certain affirmative action policies by Florida's state universities."  863 So. 2d at 295.  Prior to the proposed rule amendments, all African-American applicants to state universities received a benefit in the admissions process not available to non-minority students; under the proposed amendments, African-Americans would be subject to the same admission standards as non-minorities.  Id. at 299.  The Court noted, for standing purposes, the "'obvious impact'" of removing the advantage previously given to minority students and making "'African-American students subject to the identical admissions standards as non-minority students.'"  Id. (quoting NAACP, Inc. v. Fla. Bd. of Regents, 822 So. 2d 1, 12 (Fla. 1st DCA 2002) (Browning, J., dissenting)).  The Florida Supreme Court, therefore, held that the NAACP had shown a substantial effect on its members who were students sufficient to establish standing to challenge the proposed rule amendments.  Id.  The Court noted that a NAACP

8

member did not need to show actual rejection of admission to a state university under the proposed new admission criteria before standing would be granted. Id. at 300.

In Peace River, a regional water supply authority, the Peace River/Manasota Regional Water Supply Authority (the "Authority"), tasked with supplying potable water to customers within its boundaries, had an existing legal right under a water use permit to withdraw water from the Peace River, and thereby an interest in both the quantity and quality of the water flowing into the river. 18 So. 3d at 1083-84. In fact, the Peace River was the Authority's sole source of water. Id. at 1083. The Authority challenged the issuance of a permit to a phosphate mining company to mine alongside Horse Creek, a tributary of the Peace River. Id. at 1085-86. The Authority asserted that the mining activity could negatively affect the flow of Horse Creek into Peace River, thereby reducing the Authority's ability to withdraw water under its own water use permit. Id. at 1085. The ALJ dismissed the Authority's challenge for lack of standing, and the Second District Court of Appeal reversed. Id. at 1080-81. In finding standing, the Second District concluded that the Authority established with competent substantial evidence that it had a legal right to withdraw water from the Peace River and that right could reasonably be affected by the proposed mining activity's effect on the quantity and quality of the water flowing into Horse Creek and Peace River. Id. at 1084-85. The court noted

9

that the Authority's ultimate failure to prove the harm would actually occur was a separate question from the threshold question of whether it could allege specific injuries to its rights. Id. at 1083. The court concluded that the Authority had established specific injury sufficient to establish standing. Id. at 1085.

In both NAACP and Peace River, the respective courts concluded that the petitioners alleged a specific injury to themselves that could reasonably result from the proposed administrative action, i.e., the elimination of affirmative action policies at state universities and the reduction of water flow and quality in the sole source of potable water. While not requiring a strict "but-for" relationship between the proposed administrative action and the alleged injury, the nexus between the two was readily apparent and did not depend upon conjecture or speculation.

In contrast, the record in this matter failed to establish the type of specific injury to K.M. sufficient to establish standing. Specifically, K.M. claims standing because repeal of the Rule will allegedly take away the benefit of quality pediatric cardiac care. Unlike NAACP, the repeal of the Rule, on its face, does not take away the benefit of quality cardiac care. Nor is it readily apparent that, in the absence of the Rule, CMS-approved facilities and clinics will stop providing quality pediatric cardiac services.

K.M., therefore, must rely on Dr. Gessner's testimony to establish that the provision of quality care could reasonably be affected by repeal of the Rule.[2] Dr. Gessner's testimony, however, is too speculative on this issue to satisfy the specific injury requirement necessary to establish standing. Although Dr. Gessner testified that there was a risk the Rule repeal might lead to changes in pediatric cardiac programs that could potentially deteriorate certain aspects of a program, he immediately qualified that testimony with the statement that he did not expect physicians or facilities to lower their standards simply because of the Rule repeal. That contingent, qualified testimony about possible risks is a far cry from the connection between the administrative action and alleged injuries discussed in NAACP and Peace River.[3]

---

[2] While Dr. St. Petery opined that there was a relationship between the Rule's requirements and the quality of care provided, he did not testify that repeal would result in a diminution of quality, nor did he offer any data—or even anecdotal evidence—suggesting that K.M. might be at risk of receiving substandard care in the future if the Rule were repealed.

[3] Evaluation of this type of testimony often ultimately depends on a determination of a particular witness's credibility. Appellate courts are not permitted to substitute their judgment regarding witness credibility and the weight to be given to such evidence for that of the fact finder. See Peace River, 18 So. 3d at 1082 ("This court 'shall not substitute its judgment for that of the administrative law judge as to the weight of the evidence on any disputed finding of fact.'" (quoting § 120.68(10))); Maynard v. Fla. Unemployment Appeals Comm'n, 609 So. 2d 143, 145 (Fla. 4th DCA 1992) ("[T]he credibility of witnesses and testimony is a matter which falls solely within the purview of the . . . finder of fact.").

In sum, Dr. Gessner's testimony stated possibilities resting on speculation and conjecture insufficient to satisfy the substantially affected test. See Secure Enters., 124 So. 3d at 339 (concluding that the appellee failed to show "real or immediate" injury in fact where ALJ found rules and forms at issue would "likely cause" appellee economic injury). Because the record does not contain evidence sufficient to establish that the quality of future care K.M. might receive will be reasonably diminished by the Rule's repeal, we find that K.M. has not established injury sufficient to give her standing to challenge DOH's proposed repeal of the Rule.[4]

IV.   CONCLUSION

For the reasons stated, we find that K.M. fails to meet the "substantially affected" test and does not have standing to challenge DOH's repeal of the Rule. Accordingly, we affirm the Division of Administrative Hearing's final order dismissing K.M.'s Petition.

Affirmed.

LOGUE, J., concurs.

---

[4] As a result, we do not need to consider whether K.M. falls "within the zone of interest to be protected or regulated." See Lanoue, 751 So. 2d at 96-97 (stating that the "substantially affected" test is a two-prong test).

EMAS, J., dissenting.

I respectfully dissent. Applying our *de novo* standard of review, Office of Insurance Regulation and Financial Services Commission v. Secure Enterprises, LLC, 124 So. 3d 332 (Fla. 1st DCA 2013), I conclude that K.M. has standing and that the order of dismissal should be reversed.

The ALJ's final order determined K.M. (and the other petitioners) had no standing, and therefore, that the ALJ was without jurisdiction to adjudicate the merits of the petition. Here is the relevant portion of that Final Order:

> To have standing, therefore, Petitioners needed to prove that repeal of the Standards <u>would be the proximate cause of a real or immediate diminution in the quality of cardiac care</u> provided to CMS recipients. They did not succeed in carrying this burden . . . .
>
> The notion . . . <u>that every facility in the CMS network would suddenly stop providing quality pediatric cardiac services immediately upon the repeal of the Standards rests on pure speculation</u>—and is a little insulting to the health care professionals who personally deliver those services.
>
> Such an imagined across-the-board loss of quality care <u>is not reasonably foreseeable</u> and cannot qualify as a real or immediate injury in fact for purposes of standing.

(Emphasis added.)

The ALJ concluded that K.M. "<u>failed to prove . . . that the proposed deregulation of CMS approved pediatric cardiac facilities would, in fact, have a</u>

13

real or immediate effect on the quality of care available through the CMS network." (Emphasis added.)

K.M. asserted below, and here on appeal, that she does have standing because she established: (1) she is a CMS program beneficiary; (2) she will require future pediatric cardiac medical care through CMS providers; (3) the Rule is necessary to (a) maintain and promote quality of care and (b) minimize the risk associated with the provision of pediatric cardiac medical care; and that (4) if the Rule is repealed, there is a reasonable likelihood of a material increase in the risk of morbidity and mortality for CMS beneficiaries receiving pediatric cardiac care through the program.

The majority bases its affirmance, in large part, upon what it characterizes as K.M.'s failure to present "evidence sufficient to establish that the quality of future care K.M. might receive will be reasonably diminished by the Rule's repeal." Maj. Op. at *12.

I respectfully dissent, because I believe the record below, and the unrebutted expert testimony, demonstrates the contrary. The CMS pediatric cardiac facilities standards provide, in part:

> The Children's Medical Services pediatric cardiac facility approval process is a quality assurance process that ensures participating CMS Network cardiac facilities meet established minimum standards deemed necessary for provision of quality cardiac services to children with special healthcare needs.

14

(Emphasis added.)

The unrebutted testimony of K.M.'s two expert witnesses[5] established that it was reasonably foreseeable that the elimination of the quality assurance process will a) hinder the ability of pediatric cardiac services providers to maintain the highest level of quality of care; and b) result in a material increase in the risk of morbidity and mortality associated with the provision of pediatric cardiac services. The experts based these opinions upon their experience with the CMS program, their participation in the development of the Rule and establishment of the standards, and the data collected during site visits and site reviews of CMS facilities. The collected data is entered into a Society of Thoracic Surgeons database, and the data is reviewed and evaluated to ensure that the existing program and participating providers within the State of Florida are functioning within the range of accepted morbidity and mortality rates established by national standards.

The general concept of standing requires K.M. "to demonstrate that [she] reasonably expects to be affected by the outcome of the proceedings, either directly or indirectly." Peace River/Manasota Reg'l Water Supply Auth. v. IMC

_____

[5] Dr. Louis B. St. Petery has served as an approved CMS provider since 1974. Dr. Ira Gessner is a former member of the CMS Network Advisory Council who participated in the development of the Rule, served as a CMS statewide consultant for over 38 years and currently serves as a member of the CMS Cardiac Technical Advisory Panel.

Phosphates Co., 18 So. 3d 1079, 1083 (Fla. 2d DCA 2009) (quoting Hayes v. G'ship of Thompson, 952 So. 2d 498, 505 (Fla. 2007)).

The Florida Supreme Court has held that the "substantially affected" test is "so similar to the ["adversely affected"] standing requirement of the Federal Administrative Procedure Act, 5 U.S.C. § 702. . . that we are justified in looking to federal case law for guidance. . . ." Florida Home Builders Ass'n v. Dep't of Labor and Emp't Sec., 412 So. 2d 351, 353 n.5 (Fla. 1982). The United States Supreme Court's decision in Sierra Club v. Morton, 405 U.S. 727, 740 (1972), is therefore instructive on the standing issue before us:

> The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected { "pageset": "Sd4 through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.

(Emphasis added.) See also Florida Rock Props. v. Keyser, 709 So. 2d 175, 177 (Fla. 5th DCA 1998) (applying Sierra Club, 405 U.S. at 740).

Importantly, the concept of standing for purposes of challenging proposed agency rule is broader than the traditional notion of standing to maintain a cause of action. Indeed, "section 120.54(4) 'was intended to create an opportunity for a citizen initiated check on rule making that exceeded delegated statutory authority. . . .'" Dept. of Prof'l Reg., Bd. of Dentistry v. Fla. Dental Hygienist Ass'n, Inc., 612

So. 2d 646, 652 (Fla. 1st DCA 1993) (quoting Patricia A. Dore, <u>Access to Fla. Admin. Proceedings</u>, 13 Fla. St. U.L.Rev. 965, 1014 (1986)). As our sister court acknowledged, "the legislature did not intend that the access requirements necessary to challenge a proposed rule be synonymous with the standing requirements for bringing an action at law."[6] <u>Fla. Dental Hygienist Ass'n Inc.</u>, 612 So. 2d at 652. <u>See also</u> <u>Rosenzweig v. Dep't of Transp.</u>, 979 So. 2d 1050 (Fla. 1st DCA 2008).

In order to meet the "substantial interests" or "substantially affected" test, K.M. need not have already suffered an injury. <u>NAACP Inc. v. Fla. Bd. of Regents</u>, 863 So. 2d 294, 300 (Fla. 2003). K.M. must establish that there is either an actual injury in fact <u>or a real and immediate threat of direct injury</u>. <u>Village of Key Biscayne v. Dep't of Envtl. Prot.</u>, 206 So. 3d 788, 791 (Fla. 3d DCA 2016). In satisfying this standard, K.M.'s injury "must not be based on <u>pure</u> speculation or conjecture." <u>Lanoue v. Fla. Dep't of Law Enforcement</u>, 751 So. 2d 94, 97 (quoting <u>Ward</u>, 651 So. 2d at 1237) (emphasis added).

The ALJ determined that the proof offered at the hearing was pure <u>speculation and standing</u> therefore could not be established:

[6] It is also worth noting that in <u>Florida Home Builders Ass'n v. Dep't of Labor and Emp't Sec.</u>, 412 So. 2d 351, 352-53 (Fla. 1982), the Florida Supreme Court observed: "Expansion of public access to the activities of governmental agencies was one of the major legislative purposes of the new Administrative Procedure Act." In the instant case, the majority's decision runs contrary to this legislative purpose of expanded public access.

The notion, therefore, that every facility in the CMS network would suddenly stop providing quality pediatric cardiac services immediately upon the repeal of the Standards rests on pure speculation—and is a little insulting to the health care professionals who personally deliver those services.[7]  Such an imagined across-the-board loss of quality care is not reasonably foreseeable and cannot qualify as a real or immediate injury in fact for purposes of standing.

The ALJ's analysis overstates K.M.'s burden and misstates K.M.'s premise for standing.  K.M. and the petitioners did not seek to establish—nor were they required to establish—that "every facility in the CMS network would suddenly stop providing quality pediatric cardiac services immediately upon the repeal of the Standards."  Rather, they sought to establish (and did establish, through the unrebutted testimony of their experts), that it was reasonably foreseeable that the

_____

[7] While this last statement may have been gratuitous, it is also a bit ironic.  After all, if it is self-evident that health care professionals will always provide the very highest levels of care without the necessity of standards, then why would the legislature have perceived a need to establish the Children's Medical Services program, whose directive was to develop quality of care and service integration standards, and reporting requirements for health care providers who participate in the Children's Medical Services program? See § 391.071, Fla. Stat. (2015).  Why would the Department of Health utilize its statutory power to establish CMS network standards and credentialing requirements for health care providers and health care services?

More to the point, the existing rule at issue has, since 1977, provided that CMS-approved pediatric cardiac facilities must comply with the CMS Pediatric Cardiac Facilities Standards, which were established with the assistance and input of the CMS Cardiac Technical Advisory Panel, comprised of medical professionals, including pediatric cardiologists and pediatric cardiac surgeons.  Why would this labyrinth of rules, statutes, standards and enforcement mechanisms be in place over the last four decades if, as the ALJ appears to conclude, health care professionals will undoubtedly continue to deliver the highest level of care even in the absence of these standards?

18

elimination of the quality assurance process (as set forth in the Rule) could result in a material increase in the risk of morbidity and mortality associated with the provision of pediatric cardiac services. This showing was legally sufficient to confer standing on K.M.

In fact, one of the cases cited and discussed at length by the majority supports this very conclusion. In Peace River, 183 So. 3d at 1084, the Second District reversed the order of the ALJ, holding that the petitioner, a regional water supply authority, had standing because it "offered unrebutted evidence that it had a substantial interest in the flow of Horse Creek and the Peace River and that this interest *could* reasonably be affected by [respondent's] proposed activities." K.M. met this standing threshold, and the ALJ had jurisdiction to address the merits of K.M.'s petition.

Because K.M. established, by competent and unrebutted testimony, and not upon pure speculation and conjecture, that her substantial interest "could reasonably be affected by" the proposed repeal of this Rule, K.M. demonstrated her standing to contest the proposed repeal of the Rule and I would reverse the final order dismissing K.M.'s petition for lack of jurisdiction.

For these reasons, I respectfully dissent.

19