# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00260-COA

**THE ESTATE OF CLAUD L. JOHNSON,**                       **APPELLANT**
**DECEASED: MICHAEL JOHNSON, EXECUTOR**

**v.**

**THE KITCHENS LAW FIRM, P.A.**                               **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/15/2018 |
| TRIAL JUDGE: | HON. WILLIAM R. BARNETT |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ALAN M. PURDIE |
| | CHRISTOPHER H. CORKERN |
| ATTORNEY FOR APPELLEE: | ROBERT W. LAWRENCE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/27/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., McDONALD AND C. WILSON, JJ.**

**C. WILSON, J., FOR THE COURT:**

¶1. Claud L. Johnson passed away on June 30, 2015. In a sense, however, the disputes in this case arise more because of Claud's father, legendary blues singer Robert L. Johnson, who passed away on August 16, 1938. During Claud's lifetime, and after years of litigation handled by his attorneys, the appellee here, Claud was adjudicated to be the now world-renowned bluesman's son. After Claud's death, his last will and testament was admitted to probate in the Chancery Court of Copiah County, Mississippi. On October 20, 2016, the Kitchens Law Firm P.A. filed a "Motion to Authorize and Direct Executor to Turn Over Monies and Render an Accounting and Order Turn Over of Future Monies" in the probate

matter. Claud's estate responded to the law firm's motion and asserted affirmative defenses. Both parties filed motions for summary judgment. Special chancellor William Barnett granted Kitchens's motion and denied the estate's motion. The estate now appeals the special chancellor's judgment granting Kitchens's motion. Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY

¶2. Robert died on August 16, 1938, at the age of twenty-seven. Although he received little public recognition during his lifetime, following his death, Robert became known as one of the most influential blues singers ever to live. Not surprisingly, as Robert gained more acclaim, the royalty payments deriving from his music grew.

¶3. On June 1, 1989, fifty-one years after his death, Robert's estate was opened in the Chancery Court of Leflore County, Mississippi. Claud, Robert's alleged son, was excluded from receiving any revenue or other benefit related to his late father's music because he had not been deemed Robert's heir.

¶4. In 1991, Claud hired the Kitchens & Ellis Law Firm (Kitchens & Ellis) to represent him in an effort to establish him as Robert's heir. The parties entered a contingency fee contract (contract), wherein Claud agreed to

> set over and assign unto said firm of Kitchens & Ellis, causes of action or rights in the amount of forty percent (40%) of any and all sums of money or other benefits which they may recover or obtain for me by virtue of, or arising from, my biological relationship to the late Robert Johnson, as aforesaid, including, but not limited to, past, present, and future royalties, commissions, profits, and other benefits and/or revenues of every kind and character which have been derived, or may in the future be derived, from the sale, lease, rental or other marketing of sound or video recordings, sheet music, books, pictures, musical instruments, or devices, live or recorded performances and/or other productions and reproductions of the music and other works of Robert

2

Johnson, including any and all use of the name Robert Johnson, whether such performances, products or productions, if any, were made by Robert Johnson or by others, or by Robert Johnson and others.

In return, Kitchens & Ellis agreed to

represent [Claud] in any and all matters of every kind and character which in anywise pertain to any and all claims, causes of actions or rights which [he] now ha[s], or may hereafter have, whether known or unknown to [Claud], on account of [his] being the son of the late Robert Johnson, a musician who died in approximately 1938, whether such claims may be pursued in the State of Mississippi or elsewhere.

The contract did not provide a specific or definitive time period for performance.

¶5. Following several years of litigation, the Leflore County Chancery Court found that Claud was Robert's biological son. Unlike many other paternity matters, this case was not as simple as providing and testing DNA evidence.[1] As stated by the Mississippi Supreme

---

[1] In fact, the evidence presented at trial to prove that Robert was Claud's father was quite unconventional. Claud and his mother, Virgie Mae Cain, both testified, and Claud introduced his birth certificate listing "R.L. Johnson, laborer" as his father. *In re Estate of Johnson*, 767 So. 2d 181, 183 (¶¶8-9) (Miss. 2000). Claud also offered the deposition testimony of Eula Mae Williams, a childhood friend of Virgie Mae. *Id.* at 183-84 (¶10). In her testimony, Eula Mae stated that she and her boyfriend both witnessed Virgie Mae and Robert "engag[e] in the act" when the couples went for a "walk" in the spring prior to Claud's birth in December:

Q:   Well, let me, let me share something with you, because I'm really curious about this. Maybe I have a more limited experience. But you're saying to me that you were watching them make love?
A:   M–hm.
Q:   While you were making love?
A:   M–hm.
Q:   You don't think that's at all odd?
A:   Say what?
Q:   Have you ever done that before or since?
A:   Yes.
Q:   Watch other people make love?
A:   Yes, I have done it before. Yes, I've done it after I married. Yes.

3

Court, "[s]uch evidence would be nigh impossible to obtain since [Robert]'s grave site is unknown. As far as we know, [Robert] is buried 'down by the highway side, so [his] old evil spirit c[ould] get a Greyhound bus and ride.'" *In re Estate of Johnson*, 767 So. 2d at 184 (¶12) (quoting Robert Johnson, Me and the Devil Blues (1937)). Nonetheless, the Mississippi Supreme Court held that substantial, credible evidence supported the chancellor's finding that Claud was Robert's biological son. *Id.* at 187 (¶20). Accordingly, the supreme court affirmed the chancery court on appeal. *Id.*

¶6. After being determined Robert's heir, Claud began receiving substantial revenue through royalty agreements and the like. And pursuant to the contract, Kitchens & Ellis collected 40% of all monies Claud received "by virtue of . . . [his] biological relationship to

---

> Q: You watched other people make love?
> A: Yes, sir. Yes, sir.
> Q: Other than [. . .] other than Mr. Johnson and Virgie Cain.
> A: Right.
> Q: Really?
> A: You haven't?
> Q: No. Really haven't.
> A: I'm sorry for you.
> Q: Well, I appreciate that. And perhaps I need the wealth of experience that you have. But share with me this. Did you actually watch them engage in the act? You actually watched that?
> A: Yes.
> Q: When they were engaging in the act, was your husband (her boyfriend at the time) watching, too?
> A: Sure.
> Q: Okay. Did they watch you?
> A: Sure.
> Q: And you watched them watch you?
> A: Yes.

*Id.* at 184 (¶10).

4

the late Robert Johnson." On December 31, 2008, Kitchens & Ellis assigned its rights under the contract to Daniel W. Kitchens and John W. Kitchens, doing business as the Kitchens Law Firm P.A. (Kitchens).[2] Thereafter, Claud paid the 40% contingency fee to Kitchens until he died on June 30, 2015.

¶7. Following Claud's death, his last will and testament was admitted to probate in the Chancery Court of Copiah County, Mississippi. The court appointed Michael Johnson, Claud's son, ("Michael" or "executor") as executor. Although Claud's estate continued to receive revenue as a result of Claud's relationship to Robert, it made no payments to Kitchens following Claud's death. On October 20, 2016, Kitchens filed a "Motion to Authorize and Direct Executor to Turn Over Monies and Render an Accounting and Order Turn Over of Future Monies" (motion to authorize and direct executor) in the probate matter. Specifically, Kitchens requested the special chancellor order the estate to (1) provide current and future accountings and (2) pay Kitchens its 40% assignment of all monies Claud's estate received "by virtue of . . . [Claud's] biological relationship to the late Robert Johnson" since Claude's death, pursuant to the contract. Kitchens did not file any separate document to probate its claim.

¶8. Claud's estate responded to Kitchens's motion, asserting affirmative defenses and contending that the motion should be denied. Kitchens and the estate filed motions for

---

[2] Kitchens & Ellis made this assignment following Justice James W. Kitchens's election to the Mississippi Supreme Court, requiring Justice Kitchens to leave Kitchens & Ellis. Prior to this assignment, Daniel and John, Justice Kitchens's sons, worked as associate attorneys for Kitchens & Ellis for more than five years.

summary judgment.[3] Kitchens contended that its motion to authorize and direct executor should be granted as a matter of law because the contingency fee contract was not ambiguous and that Kitchens owned 40% of all revenue the estate received by virtue of Claud's relationship to Robert. In other words, Kitchens contended that 40% of the revenue the estate received by virtue of Claud's relationship to Robert was not actually the estate's property. Claud's estate raised a number of reasons that Kitchens's motion to authorize and direct executor should be denied: (1) Kitchens failed to probate its claim pursuant to statutory requirements, leaving its claim time-barred; (2) the chancery court lacked jurisdiction to adjudicate the contract-based claim asserted by Kitchens; (3) Kitchens did not have an enforceable contract against the estate; and (4) the contract was unconscionable. In support of its enforceability argument, the estate asserted: (a) there was no privity of contract between Kitchens and the estate/heirs; (b) the estate was not bound by the contract because the contract did not survive Claud's death; and (c) the contract was not enforceable because it could be terminated at will by Claud's estate.

¶9. On September 18, 2017, following a hearing on both parties' motions for summary judgment, Special Chancellor Barnett entered a written opinion in Kitchens's favor. Special Chancellor Barnett found that the only significant question was whether the contract survived Claud's death. The court concluded, based on Mississippi law, that it did. Special Chancellor Barnett further held that "[t]he other allegations of the [e]xecutor concerning failure to probate a claim, unconscionability of a 26 year old contract, lack of jurisdiction,

_____

[3] The estate's motion was titled "Motion to Dismiss and/or Motion for Summary Judgment."

6

lack of privity of contract, indefiniteness, violation of the rule against perpetuities[4] or any other allegations, [were] groundless, both as a matter of fact and law."

¶10.    Claud's estate filed a notice of appeal.  On appeal, the estate asserts (1) the chancery court should have dismissed Kitchens's claim because it was not properly probated pursuant to Mississippi Code Annotated section 91-7-149 (Rev. 2013) and is now time-barred under Mississippi Code Annotated section 91-7-151 (Rev. 2013); (2) the chancery court erred in granting Kitchens's motion for summary judgment because the court lacked subject-matter jurisdiction over Kitchens's claim; (3) the chancery court erred in granting Kitchens's motion for summary judgment because Kitchens does not have an enforceable contract against the estate; and (4) the chancery court erred in granting Kitchens's motion for summary judgment due to the presence of genuine issues of material fact.  We address these issues in turn; ultimately, we find no error and affirm.

## STANDARD OF REVIEW

¶11.    "When parties appeal a grant or denial of summary judgment, this Court employs a de novo standard of review."  *Waltman v. Eng'g Plus Inc.*, 264 So. 3d 758, 760 (¶7) (Miss. 2019) (emphasis omitted).  We view all evidence "in the light most favorable to the party against whom the summary-judgment motion has been made."  *Hyde v. Martin*, 264 So. 3d 730, 734 (¶14) (Miss. 2019) (citing *Miss. Baptist Med. Ctr., Inc. v. Phelps*, 254 So. 3d 843,

---

[4] In a supplemental response to Kitchens's motion for summary judgment, the estate asserted for the first time that the contract violated the Rule against Perpetuities because the contingent future interest in "40% of any and all sums of money . . . [Kitchens] may recover" failed to vest within the period of the rule.  Kitchens disagreed and asserted that the contract vested when Claud was determined to be Robert's heir.

844-45 (¶5) (Miss. 2018)). Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c).

¶12. Like the review of the grant or denial of summary judgment, "[j]urisdiction is a question of law which this Court reviews de novo." *Trustmark Nat'l Bank v. Johnson*, 865 So. 2d 1148, 1150 (¶8) (Miss. 2004). Standing is also a jurisdictional issue, and "[t]his Court reviews questions of standing de novo." *Hall v. City of Ridgeland*, 37 So. 3d 25, 33 (¶23) (Miss. 2010).

## DISCUSSION

**I.      Whether the chancery court should have dismissed Kitchens's claim because it was not probated in accordance with section 91-7-149 and is now time-barred under section 91-7-151.**

¶13. Claud's estate first contends that the chancery court should have dismissed Kitchens's motion to authorize and direct executor because Kitchens's claim is time-barred. Pursuant to section 91-7-151:

> All claims against the estate of deceased persons, whether due or not, shall be registered, probated and allowed in the court in which the letters testamentary or of administration were granted *within ninety (90) days after the first publication of notice to creditors to present their claim*. Otherwise, the same shall be barred and a suit shall not be maintained thereon in any court, even though the existence of the claim may have been known to the executor or administrator.

(Emphasis added). Section 91-7-149 provides the requisite procedures for probating a claim against a decedent's estate. Miss. Code Ann. § 91-7-149; *In re Estate of Lingle*, 822 So. 2d

8

320, 322 (¶12) (Miss. Ct. App. 2002).

¶14.    It is undisputed that Kitchens did not register and probate any claim against Claud's estate in accordance with the procedural requirements of section 91-7-149. It is also undisputed that Kitchens did not probate any claim against Claud's estate within ninety days of the first publication of notice to creditors, which occurred on September 2, 2015. But Kitchens contends that it "was not required to probate a claim because the funds due [to] it, now and in the future, are not now, nor have they ever been, part of [Claud]'s estate." We agree.

¶15.    "Section 91-7-151 has no application to a suit for possession of property by virtue of ownership." *Maxwell v. Yuncker*, 419 So. 2d 580, 583 (Miss. 1982). When Claud entered the contract in 1991, he agreed to

> [s]et over *and assign unto said firm of Kitchens & Ellis*, causes of action or rights in the amount of forty percent (40%) of any and all sums of money or other benefits which they may recover or obtain for me by virtue of, or arising from, my biological relationship to the late Robert Johnson . . . .

(Emphasis added). "A valid assignment in Mississippi is a transfer of rights or property from one party (the 'assignor') to another (the 'assignee'), in which the assignor intends to vest in the assignee a present right in the thing assigned." 1 Donald Campbell, Jeffrey Jackson & Mary Miller, *Encyclopedia of Mississippi Law* § 7:1 (2018). Thus, pursuant to the contract, Kitchens is the rightful owner to the funds that it claims. In other words, the funds are not, and never were, part of Claud's estate—they are merely being wrongfully withheld, contrary to the assignment, by the estate. Because the funds are not a part of Claud's estate, Kitchens was not required to probate its claim. *See Maxwell*, 419 So. 2d at 583 (holding

9

sections 91-7-149 and 91-7-151 have no application where appellant's claim was not for a specific money demand due or to become due but rather was an inchoate and contingent claim involving the ownership of specific property). The special chancellor therefore did not err by declining to dismiss Kitchens's claim as time-barred under section 9-71-151. This assignment of error lacks merit.

II. **Whether the chancery court erred in granting Kitchens's motion for summary judgment because the court lacked subject-matter jurisdiction.**

¶16. Claud's estate next contends that the chancery court lacked jurisdiction to hear Kitchens's claim. To begin, the estate asserts that the chancery court did not have subject-matter jurisdiction over Kitchens's claim because Kitchens did not properly probate its claim. As discussed *supra*, however, Kitchens was not required to probate its claim. The estate goes on to assert that the chancery court did not have subject-matter jurisdiction to adjudicate Kitchens's law-based claim because the chancery court is a court of limited jurisdiction. Although the estate correctly contends that chancery jurisdiction is limited, the chancery court had jurisdiction over this matter.

¶17. Under Article 6, Section 159 of the Mississippi Constitution, the chancery court has full jurisdiction over "all matters in equity" and "matters testamentary and of administration." Miss. Const. art. 6, § 159(a), (c). When a will is probated, the chancery court also has jurisdiction to hear all demands against the estate. *See* Miss. Code Ann. § 9-5-83 (Rev. 2002).[5] Kitchens's claim is a demand against Claud's estate—an estate that is being probated

---

[5] Section 9-5-83 provides:

10

in the Copiah County Chancery Court. Accordingly, the chancery court had authority to adjudicate Kitchens's claim.[6]

¶18. Relatedly, Claud's estate asserts that Kitchens lacked standing to bring its claim. The estate contends Kitchens lacked standing because Kitchens & Ellis assigned the contract to Daniel W. Kitchens and John W. Kitchens, not specifically to Kitchens. In response, Kitchens contends this argument is baseless for two reasons: (1) the assignment specifically references Kitchens at least eight times, and (2) Claud paid post-assignment amounts due under the contract to Kitchens, not to Daniel and John individually, since 2009. We agree with Kitchens.

¶19. Mississippi has liberal standing requirements. *Hall*, 37 So. 3d at 33 (¶24). "[P]arties have standing to sue 'when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" *Id.* (quoting *Burgess v. City of Gulfport*, 814 So. 2d 149, 152-53 (¶13) (Miss. 2002)). According to the supreme court, this means

---

> *The court in which a will may have been admitted to probate . . . shall have jurisdiction to hear and determine* all questions in relation to the execution of the trust of the executor, administrator, guardian, or other officer appointed for the administration and management of the estate, and *all demands against it by* heirs at law, distributees, devisees, legatees, wards, creditors, *or others . . . .*

(Emphasis added).

[6] Moreover, even if the chancery court lacked subject matter jurisdiction, "this Court . . . may not overturn the finding of the chancellor for want of subject matter jurisdiction alone." *U.S. Fid. & Guar. Co. v. Estate of Francis ex rel. Francis*, 825 So. 2d 38, 47 (¶23) (Miss. 2002); *see also* Miss. Const. art. 6, § 147.

11

the issue adjudicated in a standing case is whether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or . . . whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action.

*City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 526 (¶40) (Miss. 2005).

¶20. Here, Claud entered into the contract with Kitchens & Ellis in 1991. Years of litigation later, Claud was finally determined to be Robert's heir. Thus, pursuant to the contract, Kitchens & Ellis began receiving 40% of all funds Claud received by virtue of his relationship to Robert. On December 31, 2008, Kitchens & Ellis assigned its rights under the contract to Daniel W. Kitchens and John W. Kitchens, doing business as Kitchens. Thereafter, Kitchens began recouping 40% of the funds Claud received by virtue of his relationship to Robert. Claud was well aware of this. He signed multiple disbursement sheets following the assignment, all of which authorized and directed payment to Kitchens. Nonetheless, following Claud's death, Claud's estate withheld the funds owed to Kitchens.

¶21. Given these undisputed facts, it is clear that Kitchens has standing. At the time Kitchens filed its initial motion, Claud's estate had already withheld funds that rightfully belonged to Kitchens. In other words, Kitchens had "a present, existent actionable title or interest" in the funds being withheld from it. *S. Reg'l Corp.*, 916 So. 2d at 526 (¶40).

¶22. To the extent that Claud's estate makes a real-party-in-interest objection to Kitchens's claim, we likewise find no merit in the assertion. Pursuant to Mississippi Rule of Civil Procedure 17(a),

Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee, a party with whom or in

whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his representative capacity without joining with him the party for whose benefit the action is brought.

"A 'real party in interest' is defined as a 'person who will be entitled to the benefits of action if successful, that is, the one who is actually and substantially interested in subject matter as distinguished from one who has only a nominal, formal, or technical interest in or connection with it.'" *Welch Roofing & Const. Inc. v. Farina*, 99 So. 3d 274, 278 (¶11) (Miss. Ct. App. 2012) (quoting *Sneed v. Ford Motor Co.*, 735 So. 2d 306, 313 (¶21) (Miss. 1999)). Upon review, we find that Kitchens was the real party in interest in this matter, as it was the beneficiary of the funds received pursuant to the contract. Either way, this issue lacks merit.

> **III.** **Whether the chancery court erred in granting Kitchens's motion for summary judgment because Kitchens does not have an enforceable contract against the estate.**

¶23. In its third assignment of error, Claud's estate makes several assertions as to why Kitchens does not have an enforceable contract, namely that (1) there is no privity of contract between Kitchens and Claud's estate or heirs; (2) Kitchens does not have a vested interest in royalty payments; (3) the contract violates the Rule against Perpetuities; and (4) the contract is void for being excessive and unreasonable. Each of these contentions lacks merit.

> *a.* *Privity of Contract*

¶24. Claud's estate first contends that Kitchens's contractual claim fails as a matter of law because there is no privity of contract between Kitchens and Claud's estate or heirs. Kitchens does not dispute that there is no privity of contract between it and Claud's estate or heirs. Rather, Kitchens asserts privity of contract between it and Claud.

13

¶25.     Claud's estate correctly asserts that "to maintain an action to enforce a breach of contract . . . , a relationship of privity of contract must exist between the party damaged[,] and the party sought to be held liable for the breach." But Kitchens is also correct that the relevant privity here is between Kitchens and Claud.[7] *Allgood v. Bradford*, 473 So. 2d 402, 415 (Miss. 1985). We find privity exists between those parties.

¶26.     In 1991, Claud hired Kitchens & Ellis to represent him in an effort to establish his heirship to Robert, and the parties entered a contingency fee agreement (i.e., the contract). On December 31, 2008, Kitchens & Ellis assigned its rights under the contract to Kitchens. Thus, there is privity of contract between Claud and Kitchens. Indeed, no one raised privity or any other issue with the contract assignment before Claud died on June 30, 2015, even though Kitchens stepped into the shoes of Kitchens & Ellis and retained 40% of all monies received "by virtue of . . . [Claud's] biological relationship to the late Robert Johnson," while sending checks to Claud for his 60% portion. This issue lacks merit.

   *b. Vested Interest*

¶27.     Claud's estate next contends that Kitchens does not have a vested interest in the funds at issue. According to Claud's estate, "[t]here is nothing preventing the Estate or heirs from canceling or voiding any royalty contracts with any record companies or other third-party entities. Under such a scenario, Kitchens would have no royalty payments from which to

---

[7] The funds that Kitchens seeks in this matter belong to Kitchens pursuant to the contract entered by Claud and Kitchens. Kitchens does not claim to be owed funds under a contract entered by Claud's estate or heirs. The estate is simply the current party in possession of the funds owed Kitchens. Accordingly, privity between Kitchens and Claud's estate or heirs is not necessary.

claim a fee from." For support, Claud's estate emphasizes the contract's phrasing "of any and all sums of money or other benefits which they may recover or obtain for me." The estate cites *Goldstein & Price L.C. v. Tonkin & Mondl L.C.* for the proposition that, with contractual language such as this, an attorney's recovery of fees is contingent upon the client's actual recovery of money and not merely upon settlement or judgment. 974 S.W. 2d 543 (Mo. Ct. App. 1998). The estate's contention is misplaced.

¶28. "A right is vested when it has become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." *Estate of Greer v. Ball*, 218 So. 3d 1136, 1140 (¶15) (Miss. 2017) (internal quotation mark omitted). Here, the contract provides that Claud would

> [s]et over and assign unto said firm of Kitchens & Ellis, causes of action or rights in the amount of forty percent (40%) *of any and all sums of money or other benefits which they may recover or obtain for me by virtue of, or arising from, my biological relationship to the late Robert Johnson*, as aforesaid, including, but not limited to, past, present and future royalties, commissions, profits and other benefits and/or revenues of every kind and character which have been derived, or may in the future be derived . . . .

(Emphasis added). Based on the plain language of the contract, we find that Kitchens's right to payment under the contract vested when Claud was finally determined to be Robert's heir. Put differently, Kitchens's "consummated right" to the 40% assignment became "absolute" when Claud obtained the ability to recover "money or other benefits . . . *by virtue of, or arising from, [his] biological relationship to the late Robert Johnson . . . .*" (Emphasis added); *see Tyson v. Moore*, 613 So. 2d 817, 825-26 (Miss. 1992) (providing an attorney's right to recover a contingency fee vests when "the contingency, for which he has contracted,

15

has occurred"). The contingency for which Claud and Kitchens contracted occurred, and the contract vested, when the court determined Claud to be Robert's heir, *allowing* Claud to collect monies by virtue of his relationship to Robert.

¶29. Additionally, Kitchens is not seeking to recover money pursuant to a settlement or judgment that has not yet been collected by the awarded party. Rather, Kitchens is seeking to recover its 40% of royalties, commissions, or the like that the estate *has* collected, and will continue to collect, by virtue of Claud's relationship to Robert. Given the contract and Claud's assignment therein, Kitchens is the rightful owner of these funds. Kitchens does not contend that the estate owes it any money in the instance that no royalty payments are received. We find Kitchens has a vested interest in the funds it seeks, and the parties' contract is enforceable.[8]

### c. Excessive and Unreasonable Contract

¶30. Finally, Claud's estate contends that the contract is void because it is excessive and unreasonable. According to the estate, Kitchens has collected over $2 million under the contract, and "[t]hat is . . . more than enough compensation for the legal services actually rendered [to Claud]." But "more than enough"—as defined by Claud's estate—is not the standard for determining unconscionability of a contract or the reasonableness of attorney's

---

[8] Claud's estate also asserts that the contract violates the Rule against Perpetuities. Under the Rule, "no interest is good unless it vests within twenty-one years after the death of all persons in being when the interest is created who can affect the vesting of the interest." *Matter of Estate of Anderson*, 541 So. 2d 423, 429 (Miss. 1989). This assertion also fails because we find that Kitchens's interest in the contract has vested. "The Rule against Perpetuities is concerned with the remoteness of vesting and not with the duration of vested interests." *Id.*

16

fees. *See Caplin Enter. Inc. v. Arrington*, 145 So. 3d 608, 614 (¶14) (Miss. 2014) ("Substantive unconscionability is proven by oppressive contract terms such that 'there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach.'") (quoting *Covenant Health & Rehab. of Picayune LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 699-700 (¶12) (Miss. 2009)); *see also Smith v. Express Check Advance of Miss. LLC*, 153 So. 3d 601, 609 (¶24) (Miss. 2014); M.R.P.C. 1.5 (providing factors to be considered in determining the reasonableness of attorney's fees).

¶31. The estate's bare assertion of unreasonableness falls short of showing any unconscionability. To the contrary, Claud knowingly signed the contract. Claud also received great benefit from the contract, recouping millions of dollars after being determined Robert's heir. And contrary to the estate's contentions, the record reflects that the determination of Claud's heirship was heavily litigated for over a decade under challenging circumstances. Kitchens & Ellis undertook representing Claud in the heirship matter despite the high risk of no return at all. If Kitchens & Ellis had not succeeded in having Claud determined to be Robert's heir, the firm would have received nothing despite years of invested time and expenses. Moreover, "[a] forty-percent contingency fee is not inherently unreasonable, and similar fees have been affirmed." *See Bar-Til Inc. v. Superior Asphalt, Inc.*, 219 So. 3d 553, 559 (¶20) (Miss. Ct. App. 2017); *see also In re Guardianship of Savell*, 876 So. 2d 308 (Miss. 2004) (reversing judgment of chancellor, for violation of constitutional provision prohibiting impairment of contractual obligations, who arbitrarily decreased amount of attorney's fees from 40% to 33.3% contingency fee).

17

¶32. Further, from the time the parties entered the contract in 1991, until his death in 2015, Claud never challenged the contract's reasonableness or validity. Only now, over twenty-five years later and in an effort to recoup additional monies, Claud's estate contends that the contract is void as excessive and unreasonable. The estate's contention fails to pass muster. To the contrary, in the words of Robert himself, this was "the last fair deal gone down."[9] Had Kitchens not succeeded in the litigation to determine Claud to be Robert's heir, Claud, and now his estate, would have no monies by virtue of Claud's relationship to Robert at all—no nickel, much less a dime.[10] For these reasons, we find that the contract is not unreasonable or excessive, and this issue lacks merit.[11]

IV. **Whether the chancery court erred in granting Kitchens's motion for summary judgment due to the presence of genuine issues of material fact.**

¶33. Claud's estate last contends that the special chancellor improperly granted Kitchens's

---

[9]
*It's the last fair deal gone down*
*Last fair deal gone down*
*It's the last fair deal gone down, good lord*
*On that Gulfport Island Road*

*Ida Belle don't cry this time*
*Ida Belle don't cry this time*
*If you cry 'bout a nickel, you die 'bout a dime*
*She wouldn't cry, but the money won't mine . . . .*

Robert Johnson, Last Fair Deal Gone Down (1937).

[10] *See id.*

[11] The estate refers this Court to a pair of Colorado cases regarding contingency fee agreements and royalties that it contends are instructive on this point: *People v. Nutt*, 696 P.2d 242 (Colo. 1984) and *People v. Feather*, 180 P.3d 437 (Colo. 2007). Upon review, we find these cases unpersuasive because they are inapplicable to the issues raised here.

18

motion for summary judgment because genuine issues of material fact existed. Summary judgment is only appropriate when no genuine issue as to any material fact exists, and the moving party is entitled to a judgment as a matter of law. M.R.C.P. 56(c). On appellate review, "[i]f any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise the decision is affirmed." *Vaughn ex rel. Vaughn v. Estate of Worrell*, 828 So. 2d 780, 783 (¶10) (Miss. 2002).

¶34. This matter involves contract interpretation. Whether a contract is ambiguous is a question of law, not fact. *Lane v. Lampkin*, 234 So. 3d 338, 352 (¶40) (Miss. 2017). When a contract is not ambiguous, it is enforced as written. *Id.* "In the event of an ambiguity, the subsequent interpretation presents a question of fact for the jury . . . ." *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 752 (¶7) (Miss. 2003).

¶35. As Kitchens points out, Claud's estate has not shown any ambiguity in the contract or the existence of any disputed fact for a jury to decide. Instead, the estate expends the majority of its argument on this point reasoning that because the contract does not expressly state that it would continue after Claud's death, it is apparent that it does not. Kitchens obviously disagrees. But "[t]he mere fact that the parties disagree about the meaning . . . of a contract does not make the contract ambiguous as a matter of law." *Sledge v. Grenfell Sledge & Stevens PLLC*, 263 So. 3d 655, 664 (¶24) (Miss. 2018) (quoting *Epperson v. SOUTHBank*, 93 So. 3d 10, 16-17 (¶18) (Miss. 2012)).

¶36. Upon review, we find that the contract is not ambiguous. Signed by both parties, the contract set forth the parties' intentions and agreement. Kitchens & Ellis agreed to

represent [Claud] in any and all matters of every kind and character which in

19

anywise pertain[ed] to any and all claims, causes of actions or rights which [Claud] now [has], or may hereafter have, whether known or unknown or unknown to [Claud], on account of [his] being the son of the later Robert Johnson . . . .

And in return, Claud agreed to

set over and assign unto said firm of Kitchens & Ellis, causes of action or rights in the amount of forty percent (40%) of any and all sums of money or other benefits which they may recover or obtain for me by virtue of, or arising from, my biological relationship to the late Robert Johnson, as aforesaid, including, but not limited to, past, present and future royalties, commissions, profits and other benefits and/or revenues of every kind and character which have been derived, or may in the future be derived, from the sale lease, rental or other marketing of sound or video recordings, sheet music, books, pictures, musical instruments or devices, live or recorded performances and/or other productions and reproductions of the music and other works of Robert Johnson, including any and all use of the name of Robert Johnson, whether such performances, products or productions, if any, were made by Robert Johnson or by others, or by Robert Johnson and others.

The parties further agreed that Kitchens & Ellis's employment was "upon a contingent fee basis, and if no recovery of money or other benefit [was] made for [Claud], [he] [would] not owe [Kitchens & Ellis] any sum whatever as attorneys' fees." The contract did not include any terms regarding termination, but this omission does not frustrate the parties' agreement.

¶37. In regard to the lack of termination provision, Claud's estate relies on *In re Kennington's Estate*, 204 So. 2d 444 (Miss. 1967), to contend that a contract must contain written language stating it continues after the decedent's death to bind his estate or heirs. We disagree. *Kennington* concerned a marital settlement agreement and whether the ex-husband's estate was required to continue paying monthly support obligations to the ex-wife following his death. The ex-husband's estate argued on appeal that the monthly support obligations constituted alimony and thus terminated at death. *Id.* at 448. But the supreme

court affirmed the chancellor's finding that the estate was required to continue making payments to the ex-wife because the parties' agreement clearly stated such. *Id.* at 450. In other words, while the general rule is that periodic alimony terminates upon the death of the payor, parties can contract otherwise. *Id.* at 449; *see also Estate of Peacocke v. Peacocke*, 694 So. 2d 1252, 1254 (Miss. 1997) (stating general rule regarding periodic alimony).

¶38. The estate's reliance on *Kennington* is misplaced because this is not a periodic alimony case. Rather, this is a general contract case, and "as a general rule of law, contracts bind not only the parties thereto, but a contract also is binding upon their executors or administrators, even if they are not named in the contract." *In re Estate of Hodges*, 807 So. 2d 438, 445 (¶28) (Miss. 2002) (citing *Cox v. Martin*, 75 Miss. 229, 21 So. 611, 612 (1897)) ("[W]here the contract with the deceased is executory, and the personal representative can fairly and fully execute it as well as the deceased himself could have done, he may do so, and enforce the contract . . . .")). Although it might be the better practice to avoid disputes such as this one, the contract did not have to include language stating that it would continue after Claud's death in order for it to do so.

¶39. The contract is not ambiguous; thus, a jury is not needed for subsequent interpretation. We find the chancery court did not err in granting summary judgement in favor of Kitchens.

CONCLUSION

¶40. Viewing the record evidence in a light most favorable to Claud's estate, we do not find any genuine issue as to any material fact in this matter. The special chancellor properly construed the valid, unambiguous contract and granted Kitchens's motion for summary judgment.

21

¶41. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD AND McCARTY, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**